IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,       :       CRIMINAL ACTION
                                :       NO. 08-353
                                :
                                :
        v.                      :
                                :
HERIBERTO SANTIAGO,             :
                                :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        OCTOBER 3, 2008

        Defendant moves to suppress four pieces of evidence.
First, he moves to suppress the non-verbal statement to police,
indicating he was armed.  Second, he moves to suppress the .40
caliber handgun found on his person during a frisk outside his
vehicle.  Third, he moves to suppress all physical evidence
obtained during the search of his home, and in the alternative,
the drugs and ammunition found in the "dictionary safe."
Finally, he moves to suppress oral and written statements made at
the police station, following his arrest.

        For the reasons that follow, the motion will be denied.

I.   BACKGROUND

     A.   **Underlying Homicide Investigation**

        Defendant's arrest arose from the results of two
warranted searches conducted by Allentown Police at approximately
7:45 a.m. on November 2, 2007.  Both searches were instituted in
conjunction with an investigation for the homicide of Roberto

Febrier, committed on or about September 8, 2007, at 516 West Whitehall Street, Allentown, Pennsylvania (doc. no. 24, p.8). Febrier was killed during the course of a drug transaction. (Id.)  At the time he was killed, a man by the name of Jose Lopez was present at the scene of the homicide, allegedly to purchase $46,000 worth of drugs from a man known to him as Odalis Nunez. (Id. at Ex. A, ¶¶ 9-11).

Analysis of Jose Lopez's cellular phone calls revealed that he was in contact with someone using a particular cellular phone, identified under the number 484-764-3934, numerous times on the date of the homicide, and nine minutes before the police were notified of the shooting.  (Id. at Exhibit A, ¶31). Information from a cell tower confirmed that at the time of contact with Lopez, the caller from this phone was in the same geographic area as the homicide scene.  (Id. at Exhibit A, ¶48). The last phone call from Lopez's phone prior to the police call was from this number.  (Id. at Exhibit A, ¶46).  Police investigation suggested that Defendant used the cellular phone number in question during the relevant time period.[1]  Based upon Defendant's cell phone contact with Lopez, police reasoned that Defendant's cell phone was likely utilized to arrange a drug

---

[1]     Police noted that outgoing calls from this phone included calls to Defendant's relatives and a car mechanic who identified Defendant as the person making calls in reference to the car repairs.  (Doc. no. 24, Exhibit A, ¶¶ 34-38).

transaction, and potentially conspire to commit robbery and homicide.  After investigation of the phone usage and cell tower locations, police concluded that the phone would be found in either Defendant's home or vehicle, and accordingly obtained search warrants for these locations.

### B.   Search of Defendant's Residence and Vehicle

On November 2, 2007, at approximately 7:45 a.m., Allentown police sent two fully-armed teams of Emergency Response Team ("ERT") officers to execute searches of Defendant's residence and vehicle, respectively.  (Mots. Hr'g. 41-42, September 30, 2008).  As team two approached Defendant's vehicle, Defendant sat in the driver's seat.  Police ordered Defendant out of the vehicle, handcuffed him, and surrounded the vehicle and Defendant with armed officers.  (Id. at 44, 47-48).

After Defendant was secured, "because there was [police] knowledge of [Defendant] carrying a handgun," Sergeant Reinik asked Defendant whether he was armed.  (Id.)  Defendant nodded to his waistband, suggesting he had a weapon.  (Id.)  Defendant's affirmative, non-verbal response, prompted Sergeant Reinik to frisk Defendant, yielding the recovery of a fully loaded Smith & Wesson Walther P99, .40 caliber handgun.  (Id.)

Simultaneously, team one executed the search warrant for Defendant's residence.  In the course of this search, Officer Boyer discovered a "dictionary safe" in the laundry room,

-3-

positioned in the back of the residence.  (Id. at 73).  The
"dictionary safe" was constructed using a New English Style
dictionary with an open front cover that revealed a hidden
compartment.  (Doc. no. 24 at Exhibit C, ¶78).  Inside the safe,
Officer Boyer observed: ".40 caliber ammunition, a white powdery
substance that appeared to be cocaine, and a green leafy
vegetable matter that appeared to be marijuana."  Mots. Hr'g. 74.
Based upon these observations, a second search warrant,
specifically seeking narcotics in Defendant's residence, was
obtained.  (Id. at 90).

### C.  Interrogation at Police Station

Following the search of Defendant's vehicle and the
consequential discovery of the handgun, Defendant was arrested.[2]
On the date of his arrest, November 2, 2007, Defendant was
questioned on two separate occasions, and ultimately submitted
oral and written statements confessing ownership of the narcotics
found in his residence.

The first line of questioning, conducted by Detective
Thomas M. Fallstich, began at 8:43 a.m. and lasted approximately
thirty to forty-five minutes.  Mots. Hr'g. 49, 52, 54.  Prior to
questioning Defendant, Detective Fallstich advised Defendant of

---

[2]     Defendant was under arrest even prior to the discovery
of drugs at his residence.  At the suppression hearing, Detective
Fallstich testified that "[Defendant] did not have a license to
carry a concealed weapons."  Mots. Hr'g 51.

-4-

his Miranda rights and presented Defendant with the Allentown
Police Department Rights and Waiver form for his review.  (Id. at
53).  At the suppression hearing, Detective Fallstich testified
that Defendant seemed to understand the warnings, verbally
acknowledged the waiver of his rights, and signed the form
provided.  (Id.)  During the initial interview, Detective
Fallstich obtained biographical information about Defendant and
explored Defendant's knowledge of the September 8, 2007 homicide.
(Id.)  Defendant did not make a confession during this interview.
(Id. at 61).

The second line of questioning, also conducted by
Detective Fallstich, began at 3:05 p.m. on the same date, and
lasted approximately one hour and fifty-five minutes.[3]  (Id. at
55, 69).  Prior to initiating this interview, Defendant was once
again apprised of his Miranda rights, verbally waived these
rights, and signed a second waiver.  (Id. at 56).  During this
interview, Defendant admitted ownership of the marijuana and
cocaine found in the dictionary safe, the gun found on his
person, a bulletproof vest located in his residence, and several
masks located in his vehicle.  (Id. at 56-57).  Later, at
Detective Fallstich's request, Defendant provided a written

---

[3]    Officer Marc Boyer was also present in the room during
this line of questioning.  Mots. Hr'g. 60.

statement acknowledging his ownership of the gun and cocaine.[4]
(Id.)

## II.  ANALYSIS

### A.  Non-Verbal Statement to Police

Defendant argues that his non-verbal statement to the
police [nodding toward his waistband where the gun was found in
response to the police question as to whether he was armed]
should be suppressed as the product of unlawful coercion,
obtained in violation of Miranda v. Arizona, 384 U.S. 436, 444-45
(1966).  Miranda requires that the police give certain warnings
to a person in custody before interrogating him.  Id.  A person
is in custody if he is under arrest, or if his freedom of
movement is retained to a degree associated with a formal arrest.
New York v. Quarles, 467 U.S. 649, 655 (1984).  Interrogation
occurs where a person is subject to express questioning, or "any

_____

[4]     The statement reads: "I hereby state the gun is mine
and the coke -- the cocaine found in the laundry room is mine,
and the bulletproof vest found is also mine, and so are the masks
that were found in the house and cars.  She had nothing to do
with any of this that went on."  Defendant signed directly
beneath the statement.  Id. at 57-58.

On the second page of the statement, the following
questions and responses indicate that the statement was
voluntarily provided: "(1) Is the information contained in this
two-page statement true and correct to the best of your knowledge
and belief?" "YES"; (2) "Was the statement given of your own free
will and accord without any promises or threats?" "YES"; (3) "Do
you understand what we are taking about in this statement?"
"YES"; (4) "Are there any corrections in this statement that you
wish to make?" "NO"; (5) "Will you now sign the statement and
initial each of the two page?" SIGNED.  Id. at 58.

words or actions on the part of police . . . that police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  If a person's <u>Miranda</u> rights are triggered, statements taken in the absence of <u>Miranda</u> warnings or a proper waiver are generally inadmissible.  <u>Miranda</u>, 384 U.S. at 494.

Because Defendant was in custody and subject to interrogation, Defendant's Miranda rights were triggered. Although Defendant was not under formal arrest at the time of his statement, he was "in custody" because he was handcuffed and surrounded by armed officers.[5]  Furthermore, Defendant was subject to "interrogation" because Sergeant Reinik's asked Defendant an express question which he should have reasonably

_____

[5]   Notably, although police did not articulate probable cause, nor reasonable suspicion to justify Defendant's temporary detention, Defendant's custody was justified in these circumstances.  In executing a search warrant, officers may lawfully restrain persons present at the searched premises. <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981).  In <u>Summers</u>, the Court noted that substantial justifications for detaining occupants during a search include: minimizing the risk of harm to officers, preventing flight, and conducting an orderly completion of the search.  <u>Id.</u> at 702-703.  As clarified in <u>Muehler v. Mena</u>, an officer's authority to detain incident to a search is categorical and does not depend on the "quantum of proof justifying detention or the extent of the instruction to be imposed by the seizure."  544 U.S. 93, 99 (2005) (citing <u>Summers</u>, 452 U.S. at 705 n.19).

Here, Defendant was located in or around the automobile, the place to be searched pursuant to the search warrant.  Defendant was in a position to flee from police, and in doing so, transport the place to be searched.  Accordingly, under <u>Summers</u>, the officers were justified in detaining Defendant for the duration of the search.

known would elicit an incriminating response.  Despite the application of <u>Miranda</u> rights to Defendant's circumstances, police did not warn Defendant of his <u>Miranda</u> rights prior to the weapons inquiry.  Mots. Hr'g. 44.

Nonetheless, Defendant's non-verbal statement is admissible under the public safety exception to <u>Miranda</u>.  Under the "public safety" exception, "answers given to questions asked prior to reading a suspect his <u>Miranda</u> warnings will not be excluded from evidence if the purposes of the officers' questioning was to 'secure their own safety or the safety of the public' and 'not designed solely to elicit testimonial evidence from a suspect.'"  <u>United States v. Johnson</u>, 95 Fed. Appx. 448, 452 (3d Cir. 2004) (quoting <u>Quarles</u>, 467 U.S. at 659)).  The application of the public safety exception depends upon whether the police questioning was "objectively reasonable" to attain protection for the public or police.  <u>Quarles</u>, 467 U.S. at 659 n.8.

Here, several factors made it objectively reasonable for Sergeant Reinik to immediately determine whether Defendant was armed, rather than first administering <u>Miranda</u> warnings.  First, the hour of the search, 7:45 a.m., and the residential location of the search made it likely that children would "come through" the search area.  Mots. Hr'g. 80.  Consequently, the threat of open gunfire poses an immediate risk to the public.

-8-

Second, Sergeant Reinik possessed independent knowledge that
Defendant carried a handgun on other occasions.  (Id. at 44).
Likewise, the likelihood that Defendant may be armed increases
public risk.[6]  Finally, the violent underlying homicide
investigation leading to the search of Defendant's home and
vehicle elevated safety concerns for the search.[7]  Because these
factors formulate an objectively reasonable threat to police and
public safety, the Court finds that the public safety exception
articulated in Quarles applies.

Moreover, even withstanding the fact that Defendant was
handcuffed and "not going anywhere," prior to Sergeant Reinik's
weapons inquiry, the public safety exception is still applicable.
Mots. Hr'g. 106.  Courts have found pre-Miranda questioning
objectively reasonable in situations where police have already
secured the individual by restrictive measures.  United States v.
Massenberg, 45 Fed. Appx. 115, 118 n.1 (3d Cir. 2002).  For

_____

[6]     Courts have admitted pre-Miranda questioning in
situations where specific individuals were known to arm
themselves.  Although the Third Circuit has not reached the issue
as to whether pre-Miranda questioning is appropriate where an
individual is likely armed, the Third Circuit cited United States
v. Knox to demonstrate the Eighth Circuit's resolution to the
issue.  United States v. Massenberg, 45 Fed. Appx.115, 118 n.1
(3d Cir. 2002) (citing 950 F.2d 516, 519 (8th Cir. 1991)).  In
Knox, the Eighth Circuit held that responses to pre-Miranda
question whether drug dealer had a gun was admissible because
drug dealers are known to arm themselves.  Id.

[7]     In Leveto v. Lapina, the Third Circuit recognized that
there is a need for increased precautions when conducting a
search related to a violent crime.  258 F.3d 156, 171 (3d Cir.
2001).

example, the Eighth Circuit upheld the admission of defendant's pre-Miranda response to question "is there anything we need to be aware of?" asked of handcuffed defendant with prior gun and drug dealing involvement.  Id. (citing United States v. Williams, 181 F.3d 945, 953-54 (8th Cir. 1999)).  Similarly, the Ninth Circuit permitted pre-Miranda gunpoint questioning of a handcuffed suspect about whether there was a gun in his car.  Id. (citing United States v. Brady, 819 F.2d 884, 887-89 (9th Cir. 1987)).  Under the Williams and Brady rationale, the non-verbal statement by Defendant here remains admissible.

### B.  Gun Found on Defendant's Person

Assuming the above statement is suppressed, Defendant moves to suppress the gun found on his person during the frisk outside his vehicle.  Defendant argues that a police frisk for weapons constitutes unreasonable force to effectuate a search.[8] However, the Court need not reach this issue because Defendant's non-verbal statement that he was armed is admitted under the public safety exception to Miranda.  Thus, Defendant's non-verbal statement created at least reasonable suspicion that Defendant was armed, justifying a frisk under Terry v. Ohio.  392 U.S. 1

---

[8]     Michigan v. Summers provides that police can lawfully restrain persons present at the search if a substantial justification exists.  452 U.S. 692, 705 (1981).  The authority to detain an individual under Summers inherently encompasses the "authority to use reasonable force to effectuate the detention." Muehler, 544 U.S. at 99.

(1968).

## C.   <u>**Physical Evidence Found in Defendant's Residence**</u>

Defendant moves to suppress all physical evidence recovered from his residence, arguing that the evidence was obtained in violation of his Fourth Amendment right against illegal search and seizure.[9]  Specifically, Defendant contends that the affidavit substantiating the search warrant for his residence lacked probable cause.  As an alternative argument, Defendant moves to suppress the drugs and ammunition found in the dictionary safe, arguing that the search inside the dictionary safe exceeded the scope of the search warrant.[10]

### 1.   **Probable Cause for Search Warrants**

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  Const. amend IV.  Evidence obtained pursuant to a warrant that does not comply with the Fourth Amendment requirements may be excluded from evidence at trial by the exclusionary rule.  <u>United States v. Leon</u>, 468 U.S.

---

[9]   In Part I. of Defendant's Memorandum in support of his motion to suppress physical evidence, he argues that "all" physical evidence resulting from the search should be suppressed. (Doc. no. 22).

[10]   In Part II.(F) Defendant specifically argues that the items found in the "dictionary safe" should be suppressed.  (Doc. no. 22).

897, 906 (1984) (noting, however, that the exclusionary rule is a judicially created remedy, not a constitutionally mandated one).

An affidavit in support of a search warrant must establish probable cause to believe that evidence of a crime will be found at the particular location, at the time of the search. Illinois v. Gates, 462 U.S. 213 (1983).  As noted in Gates, "probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) (citing Gates, 462 U.S. at 232).  Therefore, "the task of a magistrate is to 'make a practical, common-sense decision whether . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Jones, 994 F.2d at 1056 (citing Gates, 462 U.S. at 238).

The Court must give "great deference" to the probable cause determination of the issuing judge.[11] United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) ("The Court need not determine whether probable cause actually existed, but only whether there was a substantial basis for finding probable cause." (quotations omitted)).  The inquiry is limited to the facts that were before the issuing judge, i.e., the affidavit, and "the resolution of doubtful or marginal cases in this area

---

[11]    The issuing judge in this case was Judge Kelly Banach, of the Lehigh County Court of Common Pleas.

should be largely determined by the preference to be accorded to warrants." Id. (quotation omitted).

The issuing judge need not have based her finding on "direct evidence linking the place to be searched to the crime":

Instead, probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide the fruits of his crime. A court is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.

Id. at 305-06.

In this case, the affidavits presented in support of the search at issue (doc. no. 24, Exs. A, B) contain ample indicia of probable cause that Defendant's cellular phone was evidence of a crime. As detailed in the background section of this memorandum, cellular phone records revealed that the cell phone identified under number 484-764-3934 called Lopez, who was located at the homicide scene, nine minutes before the homicide was reported. In addition, an analysis of the cellular telephone records supports the conclusion that the phone in question was

operated by Defendant at the time of the call placed to Lopez.[12]
Furthermore, a "ping" of the cellular phone revealed the
geographic location of the phone and led police to conduct a
surveillance of Defendant to determine the potential search
locations for the cellular phone.  (Doc. no. 24, Exhibit A ¶49).
This surveillance substantiated the police belief that the
cellular phone would be found in Defendant's residence and
vehicle.  (Doc. no. 24, Exhibit A ¶¶65-73).  The preceding facts,
as sworn in the affidavit, create a substantial basis for the
issuing judge to conclude that probable cause existed to suggest
Defendant's cellular phone would likely contain evidence of a
crime.

### 2.  Scope of Warrant for Defendant's Residence

Assuming the warrant for Defendant's residence is
supported by probable cause, Defendant argues that police
exceeded the scope of the search warrant when they searched
inside the dictionary safe.  Consequently, Defendant argues that
the drugs and ammunition found in the dictionary safe should be
suppressed.  Importantly, the police did not confiscate the items
in the dictionary safe at the time of the initial search, but

---

[12]    In drawing this conclusion, police examined cellular
phone records for this phone number from September 4, 2007
through September 11, 2007.  During this time period, there were
several outgoing phone calls to a car mechanic who identified
Defendant as the person making the phone calls, and Defendant's
relatives.  (Doc. no. 24, Exhibit A ¶¶34-38).

instead used these observations to substantiate probable cause for a <u>second</u> search warrant, specifically seeking narcotics. Accordingly, the Court must determine whether these observations were lawfully obtained.

In <u>United States v. Ross</u>, the Supreme Court held that "a lawful search of fixed premises generally extends to the entire area in which the object of the search may be found." 456 U.S. 798, 820 (1982). To clarify this point, the Court in <u>Ross</u> noted, "a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found." <u>Id.</u> at 821. Moreover, places on the premises which may contain the item are not excluded "merely because some additional act of opening may be required." <u>Id.</u> at 821 n.27.

Here, the warrant for the search of Defendant's home did not limit the officers to a certain part of the home. Under <u>Ross</u>, police officers were justified in searching any area within the home where the listed items could be found. Notably, the listed items in the warrant could have conceivably been located in the dictionary safe.[13] Because the officers' observance of

---

[13]      At the hearing on the motion to suppress, Detective Lake opined that the cell phone which was ultimately recovered could have fit inside the dictionary safe. Mots. Hr'g. 18. Items listed in the warrant include: "the cellular telephone bearing telephone number 484-764-3934, any devices, components, or items associated with this cellular number, including: packing materials, the "sim" or memory card, battery, chargers, carrying cases, and other items related to this cellular phone; documents

the items in the dictionary safe was within the scope of the search warrant, such observations may properly serve as probable cause for the second search warrant.

### D.  **Oral and Written Statements at Police Station**

Defendant moves to suppress his statements to police, making two arguments: (1) statements were obtained pursuant to an unlawful arrest; and (2) statements were the product of police coercion.

The Court must first determine whether Defendant's statements were made pursuant to a lawful arrest.  A confession obtained through custodial interrogation after an illegal arrest should be excluded unless intervening events break the causal connection between the illegal arrest and the confession.  United States v. Butts, 704 F.2d 701, 704, 705 (3d Cir. 1983) (citing Brown v. Illinois, 422 U.S. 590, 602 (1975).  Whether an arrest is constitutionally valid depends upon whether at the time of the arrest, the officer had probable cause to make it.  Id. (citing Beck v. Ohio, 379 U.S. 89, 91 (1964).

Here, at the time of Defendant's arrest, probable cause arose to arrest Defendant once the weapon was found on

---

and paperwork related to the purchase and maintenance of this cellular telephone, to include the receipt for the purchase of the cellular telephone, the owner's manual, prepaid phone cards, receipts for the purchase of prepaid phone cards, and other related documents; and documents identifying the persons residing or staying at 138 South Thirteenth Street, Allentown, Pennsylvania." (Doc. No. 24, Exhibit A).

-16-

Defendant's person because, as Detective Fallstich testified, "[Defendant] did not have a license to have a concealed weapons." Mots. Hr'g. 51.  Thus, both the non-verbal statement indicating that Defendant was armed and the weapon found on Defendant at the time of the search of the vehicle both support a finding of probable cause to arrest Defendant.

The Court must next consider whether Defendant was coerced into making the statements following his legal arrest. Because Defendant was in custody and subject to interrogation during both lines of questioning, Defendant's Miranda rights were applicable.  However, an individual can waive his Miranda rights, provided the waiver is made voluntarily, knowingly, and intelligently.  Miranda, 384 U.S. at 444.

Under Moran v. Burbine, a valid waiver must meet a two-pronged test: (1) waiver must be voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception;" and (2) "waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  475 U.S. 412, 421 (1986).  "Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that Miranda rights have been waived." Id.  An analysis of the totality of circumstances surrounding the

-17-

interrogation include an inquiry into "police coerciveness, the length, location and continuity of the interrogation, the defendant's maturity, education, and physical and mental health." United States v. Swint, 15 F.3d 286, 289 (3d Cir. 1994).

Both Defendant and the Government attest that Defendant waived his Miranda rights verbally, and by signing a written waiver.  Defendant argues, however, that his waiver was the product of deception.[14]  Specifically, Defendant contends that he submitted his confession only after suggestion from police that his girlfriend may be suspected as responsible for the illegal contraband.

Detective Fallstich acknowledges that he interviewed Defendant's girlfriend, Kiana Rodriguez, sometime between Defendant's first and second interviews.  Mots. Hr'g. 59, 61. Then, during Defendant's second interview, Fallstich told Defendant that because both Ms. Rodriguez and Defendant were present in the residence, he "needed to know whose drugs they were."  (Id. at 64).  Fallstich informed Defendant that Ms. Rodriguez was at the station, but did not specify as to whether she was "[being] held" by police.  (Id. at 65).  At some point thereafter, Defendant made the oral and written statements at issue.

---

[14]    In oral argument, Defendant confirmed that he does not allege the waiver was a product of intimidation or coercion. Mots. Hr'g. 117.

Under these circumstances Defendant's <u>Miranda</u> waivers are validly executed, and his oral and written statements are not a product of police deception.  It is true that knowledge that police suspected Ms. Rodriguez's potential involvement with the drugs at the residence may have motivated Defendant to incriminate himself and to attempt to absolve Ms. Rodriguez of responsibility.  However, telling Defendant that "both persons were in the house and [Detective Fallstich] needed to know whose drugs they were, whether they were hers, his, or both of theirs," Mots. Hr'g. 64, does not constitute deception.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :      CRIMINAL ACTION
                                  :      NO. 08-353
        v.                        :
                                  :
HERIBERTO SANTIAGO                :

## O R D E R

**AND NOW**, this **3rd** day of **October, 2008,** upon consideration of Defendant's Motion to Suppress Physical Evidence and Statements (doc. no. 22), Government's response thereto (doc. no. 24), and the evidentiary hearing on the motion, it is hereby **ORDERED** that the motion is **DENIED.**


        **AND IT IS SO ORDERED.**


         s/Eduardo C. Robreno

            **EDUARDO C. ROBRENO, J.**